UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

ROBERT HATFIELD                    )
                                   )
        Plaintiff,                 )
                                   )
v.                                 )        No. 3:20-CV-00152-JRG-HBG
                                   )
COVENANT MEDICAL GROUP, INC.,      )
                                   )
        Defendant.                 )

## MEMORANDUM OPINION AND ORDER

Plaintiff worked as a urologist for Defendant at a hospital and clinic. Defendant is a large hospital corporation. Plaintiff performed surgeries and had responsibilities over patient care, which required him to supervise medical staff. His responsibilities were listed in an employment contract. Plaintiff's employment ended in termination, and Plaintiff believes that Defendant violated the ADA and FMLA. Plaintiff thinks he was discriminated against for a substance abuse disability and for requesting leave, but Defendant argues that it terminated him for cause.

Plaintiff filed this lawsuit, claiming damages under the ADA, FMLA, and breach of contract. The Parties conducted discovery, and now that discovery has closed, Defendant filed a Motion for Summary Judgment. Plaintiff responded in opposition, and Defendant filed a reply brief. After thoroughly reviewing the Parties' briefs and exhibits, Defendant's Motion for Summary Judgment is GRANTED.

### I.    Background

On January 1, 2016, Plaintiff began his employment with Defendant as a urologist. During his employment, his conduct was governed by an employment agreement ("Employment Agreement"). Under the Employment Agreement, he was required to comply with "Physician

Requirements" or "Physicians Duties" , among other things, "Supervise, direct and control all clinical employees of CMG who assist the Physician in the provision of medical care to patients[,]" "[c]onduct himself in a professional and courteous manner" and "[c]omply with the reasonable policies and procedures adopted by CMG from time to time, which are applicable to physicians employed by CMG." [Doc. 54–1, PageID 1278]. If Plaintiff failed to satisfy "Physician Requirements" or "Physicians Duties," defendant could terminate him for cause after giving him written notice and an opportunity to cure the failure. [*Id.* at PageID 1290–91]. If Defendant gave Plaintiff written notice, and Plaintiff failed to correct the failure or take steps to correct the behavior within ten days, Defendant could terminate him. [*Id.* at PageID 1291]. Defendant was only required to give one written warning or cure period in any 12–month period; instead, if there was another breach or failure, Defendant could terminate Plaintiff immediately. [*Id.*]

The Employment Agreement also outlined certain conduct that was immediately terminable for cause, including:

> (4) Reasonable substantiated determination by CMG of Physician's (i) addiction to or misuse of drugs or alcohol (ii) verbal, physical, or sexual abuse of patients, CMG employees or others;
>
>     . . . .
>
> (7) The reasonable substantiated determination by CMG that Physician has at any time failed to follow applicable standard of care in providing medical care and/or treatment to patients . . . .

[Doc. 54–1, PageID 1289–90]. If Plaintiff breached the Employment Agreement for immediately terminable conduct, Defendant only needed to give him written notice of the termination. [*Id.* at PageID 1290].

While an employee, Plaintiff's responsibilities required him to work in a clinic setting and in a hospital setting. Although he worked in the hospital, the hospital itself was not his employer.

2

He had hospital privileges that permitted him to work in the hospital. The hospital medical office was, more or less, responsible for the medical treatment that occurred in the hospital, meaning the hospital had some oversight of Plaintiff's conduct.

During his employment, Plaintiff had some disciplinary issues. In January of 2017, Plaintiff gave a clinic employee a recitation of his sexual exploits. While Plaintiff recited these exploits, Plaintiff left his Dictaphone on, which recorded everything. The transcriptionist who came across the recording complained. Defendant's President, Monty Scott, discussed the issue with Plaintiff and told him that he should not be talking about his sexual exploits at work and employees would be offended. During this discussion, Mr. Scott reviewed CMG's Harassment policy with Plaintiff, and Dr. Hatfield apologized. Similarly, in late 2017, Plaintiff and Mr. Scott discussed some other issues, including tardiness. [Hatfield Depo, Doc. 54–1, PageID 1256]. The record is silent regarding whether CMG gave him written notice of any failures under the Employment Agreement and an opportunity to cure those failures.

Also during this time, Plaintiff suffered from substance abuse disorder, anxiety, and depression. Eventually, his substance abuse disorder began affecting his work, and employees of CMG and Fort Sanders Regional Medical Center reported two particular incidents. The first reported incident occurred on May 3, 2018, when a clinic employee saw Plaintiff stumbling and bumping into another employee, and a clinic employee said that Plaintiff smelled of alcohol. [Doc. 61, PageID 1586]. Defendant's Human Resource's Director, Eric Morris, learned of this event on May 11, 2018. [*Id.* at PageID 1585–86]. After learning about the events at the clinic, Mr. Scott and Craig Brent, Defendant's Vice President, decided to have a meeting with Plaintiff about the incident. [Doc. 62, PageID 1608]. They had difficulties in scheduling the meeting and never had it, in part, because of the second alcohol related incident on May 17, 2018.

On May 17, 2018, six days after Defendant learned about the incident at the clinic, Plaintiff went to work at Fort Sanders Regional Medical Center after a night of drinking alcohol. He drank an unknown amount of boxed wine until an unknown time, possibly as late as two a.m. He may have had another glass when he woke up to steady himself, but he cannot remember. Regardless of when he last drank or the amount of wine that he had, when he woke up in the morning, he went to work. That day, he performed approximately four surgeries. During the surgeries or on a break, he took alprazolam (generic Xanax) to lessen the effects of alcohol withdrawal. Plaintiff disputes none of these facts.

During the day, employees of Fort Sanders Regional Medical and CMG began to intervene. Around midday, a neurosurgeon confronted Plaintiff and asked if he was okay. Plaintiff said he was fine. Also, someone filed a report that Plaintiff smelled like alcohol. Eventually, an employee told him that he needed to go to the Medical Staff Office. While the Medical Staff Office was not Plaintiff's employer, it had some responsibility for the medical staff that practiced at the hospital. Members of the hospital staff took Plaintiff for alcohol and drug testing at 1:40 pm. He took a breathalyzer test, and it registered over the legal limit to operate a vehicle. Once Mr. Scott learned about the situation and the alcohol test, Mr. Scott placed Plaintiff on administrative leave and told him not to report to work pending an investigation.

At his deposition for this case, he readily admitted to showing up to the hospital under the influence of alcohol and performing surgery while under the influence and taking generic Xanax during surgery or during a break from surgery. In addition to admitting his use of substances, he readily admits that his conduct violated the Employment Agreement.

While on administrative leave, Plaintiff was in contact with Mr. Morris, and Plaintiff sought in-patient substance abuse treatment. Plaintiff called Mr. Morris twice, and they exchanged a few

emails. On May 24, 2018, Plaintiff informed CMG of his intention to obtain drug and alcohol treatment at Bradford Health in Birmingham, Alabama, informed CMG that he would be gone for a period of time, and advised CMG that he "wanted to make sure his privileges . . . would be protected while he was on leave of absence." (Morris Dep. 146-48, Ex. 15). After that call, Mr. Morris sent Plaintiff FMLA certification forms and an email stating:

> Thank you for speaking with me, today. I appreciate our communication over these past three days and your concerns. I have attached the FMLA certification papers. Your provider will need to sign and send back to me. I will start the process for FMLA but these documents should come back, within seven days.

> Also, I would encourage you to give authorization to the provider to communicate with, while you are on LOA. While you are out, we will use your CTO time to maintain wages and benefits. I'll keep you abreast of future developments.

[Doc. 54–1, PageID 1314].

Plaintiff never returned the form, but he did give Defendant limited access to his health records. His ability to complete the forms, according to him, was limited because he did not have access to electronics during the beginning of rehab, which started the day after he received the forms.

While Plaintiff received treatment for substance abuse, Defendant investigated. During the investigation, HR Director Morris conducted numerous interviews. The results of the interviews were mixed. While many employees seemed to like working with Plaintiff, many reported that he often made jokes of a sexual nature, arrived late for work, and showed up to work smelling like alcohol. One employee stated that on at least one occasion, she questioned whether he should treat patients based his condition when arriving to work. One time when Plaintiff showed up to work smelling like alcohol, two employees made a contingency plan regarding what to do if Plaintiff was intoxicated. One employee reported that Plaintiff would tell him or her "to put on earmuffs" when he was talking, ostensibly so that he or she would not hear Plaintiff talking to others.

5

After the investigation, HR Director Morris, Vice President Brent, and Monty Scott discussed the outcome of the investigation. Based on the investigation and the May 17, 2018 incident, they decided to terminate Plaintiff. Defendant decided to fire Plaintiff on June 20, 2018. President and CEO Monty Scott sent him a short letter, stating:

> After Investigation, Covenant Medical Group, Inc. has decided, pursuant to the terms of your employment agreement, to terminate your employment for cause effective this date, 6/20/18. Please be advised that you may be eligible for rehire in the future, subject to the policies and procedures in effect at that time.

[Doc. 70–1, PageID 1813].

During discovery, Plaintiff learned about five physicians that previously worked for Defendant, and he argues that they were treated better than him. The Parties agreed to keep the physicians anonymous. The Parties have the following information regarding the anonymous physicians:

1. Physician 1 smelled like alcohol, and Defendant suspected Physician 1 used medical leave, ostensibly to receive counseling and treatment. Physician 1 returned to work, but people complained that Physician 1 smelled like alcohol after returning. Again, Physician 1 took FMLA leave. After returning again, Physician 1 failed an alcohol test taken by the Tennessee Medical Foundations Physicians Health Program. [Doc. 74–2, PageID 2932]. Then, Physician 1 went on leave a third time. Physician 1 did not return, and Physician 1 and CMG decided to part ways, stating, "we reached a mutual agreement to end the contract."

2. Physician 2 had anger and behavior problems, including the use of language. President Scott counseled Physician 2 about the behavior. After the counseling, Physician 2 on various occasions smelled like alcohol, body odor, and lacked cleanliness. One day, Physician 2 did not show up to work. Defendant learned that he was being evaluated, and Physician 2 was allowed to use FMLA when seeking treatment for chemical dependency. Defendant and Physician 2 could not come to an agreement about how Physician 2 should return to work, and Physician 2 resigned.

3. Physician 3 had anger issues. Physician 3 took an approved leave of absence to address those issues. His leave of absence was not FMLA leave. He returned to work.

4. Physician 4 had anger and alcohol issues. He also had a domestic incident involving his or her spouse. Defendant placed Physician 4 on administrative leave. Physician 4 requested FMLA, and he received it based on Post-Traumatic Stress Disorder. Physician 4 returned to work.

5. Physician 5 tested positive for alcohol while at work. Physician 5 was terminated as soon as the paperwork was finished.

The facts above are not all the facts presented by either Party for purposes of the Motion for Summary Judgment. However, these are the facts that the Parties agree on, and the above facts do not require the evidence to be weighed.

## II.    Standard

Summary judgment is proper when the moving party shows, or "point[s] out to the district court," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), that the record—the admissions, affidavits, answers to interrogatories, declarations, depositions, or other materials—is without a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a), (c). The moving party has the initial burden of identifying the basis for summary judgment and the portions of the record that lack genuine issues of material fact. *Celotex*, 477 U.S. at 323. The moving party discharges that burden by showing "an absence of evidence to support the nonmoving party's" claim or defense, *id.* at 325, at which point the nonmoving party, to survive summary judgment, must identify facts in the record that create a genuine issue of material fact, *id.* at 324.

Not just any factual dispute will defeat a motion for summary judgment—the requirement is "that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the outcome of the case under the applicable substantive law, *id.*, and an issue is "genuine" if the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In short, the inquiry is whether the record contains

7

evidence that "presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. When ruling on a motion for summary judgment, a court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. A court may also resolve pure questions of law on a motion for summary judgment. *See Hill v. Homeward Residential, Inc.*, 799 F.3d 544, 550 (6th Cir. 2015).

## III. Evidentiary Issues

The Parties' filings in this case are extensive; the Plaintiff's opposition alone is 44 pages, not including his response to Defendant's statement of material fact, unsealed exhibits, sealed exhibits, and statement of additional facts. In Plaintiff's 44–page brief, he claims that there are over fifteen disputes of material fact, many of which are neither in dispute nor material. The volume of material, the abundance of objections, and the false creation of disputed facts, whether intentionally or not, obfuscate this case. The Court has taken great care to diligently go through the Parties' arguments and submissions.

Before reciting the facts for the purposes of summary judgment, Plaintiff's objections to Defendant's Statement of Material Facts need to be addressed. Plaintiff objects or disputes a majority of Defendant's statements. Plaintiff's objections include objecting to a statement because it includes multiple statements, objecting because of hearsay, and objecting on authenticity grounds. Considering the vast number of objections and disputed facts, the statement of material facts is practically worthless. The Court has thoroughly reviewed the entire record, and this motion is largely decided on testimony provided by the Parties. Some nuance and details are provided by

emails sent between the Parties, which are not disputed, and two disputed items—the breathalyzer results and notes made by Mr. Morris during the investigation.

Plaintiff objects to the breathalyzer report on the grounds that "they are not Plaintiff's records and therefore are unauthenticated documents that are inadmissible hearsay and cannot be considered in support of CMG's motion for summary judgment. Plaintiff further objects to the citations to the Plaintiff's deposition in which he was reading from Exhibits 12 and 13 (Hatfield Dep. 124-129), because the contents of Exhibit 12 and 13 is inadmissible hearsay, which remains inadmissible hearsay even if Plaintiff was asked to read from these documents during his deposition and objects to CMG's reliance on the cited portions of the Scott deposition because they do not support the averments of Statement 17." [Doc. 74, PageID 2652–53]. Plaintiff cites Rules of Evidence 801 and 802 without elaboration. Plaintiff's objections are without merit. The exhibits are not offered to prove the truth of the matter asserted by the report—that is that Plaintiff was in fact intoxicated. Instead, the report is offered as grounds for dismissal, that is, Defendant had a report provided by Tennessee Drug and Alcohol that stated that Plaintiff was under the influence of alcohol while at work, a fact already admitted by Plaintiff. Further, the authenticity of the document is not in question. Plaintiff indicated at his deposition that this was the report that he signed, and his signature is on the document. Therefore, the report is admissible for its purpose, not to prove that Plaintiff was intoxicated to a particular blood-alcohol concentration, but instead that Defendant had a document, signed by Plaintiff, indicating that he was intoxicated.

Similarly, the notes and statements taken by Mr. Morris during the interview are also properly before the Court. The notes say that some, but not all of the employees, smelled alcohol on Plaintiff on numerous occasions and at least one person thought that he should not see patients. [Look at exhibit 11 and 14]. Again, these statements are not used as truth of the matter asserted—

9

that Plaintiff showed up to work smelling like alcohol or that someone thought that he was unfit to see patients. The statements are used as a basis for its decision to terminate Plaintiff, whether the underlying facts were true or not. As far as authentication, the person who made the notes testified that those are his notes.

## IV. Discussion

Plaintiff brings claims under the ADA, FMLA, and Employment Agreement. Overall, Plaintiff's contention is that Defendant terminated him for improper reasons. Defendant disagrees and argues that it terminated him for his misconduct. The Court will take up the issues out-of-order, first addressing the breach of contract claim, ADA, and finally the FMLA. Ultimately, Defendant's arguments prevail.

### a. Breach of Contract

Defendant argues that it is entitled to summary judgment as to Plaintiff's breach of contract claim because it terminated Plaintiff according to the plain language of the Employment Agreement based on his misconduct. [Doc. 59, PageID 1487–88]. Plaintiff disagrees and states that there are disputes of material fact regarding "(a) whether CMG terminated Dr. Hatfield's employment with proper cause and (b) whether CMG waived its right to assert the first uncured material breach as a bar to recovery." [Doc. 75, PageID 3102]. Regarding his second point, Plaintiff states that Defendant waived the right to terminate him regarding the Dictaphone situation, being tardy, and discussing Defendant negatively with other employees. [*Id.* at PageID 3105].

Under Tennessee law, a breach of contract claim has three parts: (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *ARC LifeMed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1,

26 (Tenn. Ct. App. 2005). Determining the parties' responsibilities under a contract is a question of law. *Forrest Const. Co., LLC v. Laughlin*, 337 S.W.3d 211, 221 (Tenn. Ct. App. 2009). "When interpreting a contract, 'the words expressing the parties' intentions should be given their usual, natural and ordinary meaning.'" *Id.* at 222 (quoting *Taylor v. White Stores, Inc.*, 707 S.W.2d 514, 515 (Tenn. Ct. App. 1985). The Tennessee Supreme Court requires courts "to first look to the plain language of the contract and to ascertain and effectuate the parties' intent as reflected in that language." *West v. Shelby Cty. Healthcare Corp.*, 459 S.W.3d 33, 41–42 (Tenn. 2014). When "the contractual language is clear and unambiguous, the literal meaning of the contract controls the dispute and the language used in the contract is construed using its plain, ordinary, and popular sense." *Id.* at 42 (quoting *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn.2008) (internal quotation omitted).

Looking to the Employment Agreement, Defendant could terminate Plaintiff for cause when there was a "[r]easonable substantiated determination by CMG of Physician's (i) addiction to or misuse of drugs or alcohol (ii) verbal, physical, or sexual abuse of patients, CMG employees or others . . . . " [Doc. 54–1, PageID 1289–90]. The Employment Agreement goes on to say that if that terminable conduct occurred, CMG could immediately terminate Plaintiff upon written notice. These sections of the contract are unambiguous; therefore, the plain meaning of the words binds the Parties. *West*, 459 S.W.3d at 41–42.

The undisputed material facts state that prior to his termination, Defendant had reports, at a minimum, that Plaintiff smelled of alcohol and bumped into another employee on May 3, 2018, then arrived to work on May 17, 2018, smelling like alcohol, performed surgeries while under the influence of alcohol, and then had a positive breathalyzer test.

11

A reasonable jury could not find that these undisputed facts do not rise to the "[r]easonable substantiated determination by CMG of Physician's . . . misuse of drugs or alcohol . . . ." Because (1) the plain meaning of the contract permitted Defendant to terminate Plaintiff with a *reasonable substantiated determination* of misuse of drugs or alcohol and (2) Defendant gave Plaintiff written notice of his termination, Defendant did not breach the Employment Agreement.

Plaintiff's counterarguments and purported dispute of material facts do not save his claim. Plaintiff argues that there is a dispute of material fact regarding the real reason for his termination, which will be discussed further when discussing the ADA and FMLA. Plaintiff cites no authority for his position that Defendant's motivation for terminating the Employment Agreement after Plaintiff's breach plays a role in whether he can recover damages. Similarly, Plaintiff argues that Defendant cannot rely on the Dictaphone incident, tardiness, and discussing Defendant negatively with other employees as grounds because Defendant waived those breaches. Resolving this question is not necessary considering Defendant had grounds for terminating the Employment Agreement. Last, Plaintiff argues that Defendant could not terminate his Employment Agreement because of a failure to meet the applicable standard of care because Defendant did not have an expert to discuss a physician's standard of care. Again, Defendant does not need to rely on any provision of the Employment Agreement discussing the applicable standard of care because the undisputed material facts show that Defendant could terminate Plaintiff under the misuse of drugs and alcohol provision.

Under the Licensing Agreement, Defendant could terminate the Licensing Agreement with a ""[r]easonable substantiated determination by CMG of Physician's (i) addiction to or misuse of drugs or alcohol . . . . " [Doc. 54–1, PageID 1289–90]. Defendant had at least a reasonable substantiated determination that Plaintiff misused drugs and alcohol as Defendant knew that he

performed surgery while intoxicated, admitted to taking generic Xanax during surgery, and multiple employees reported that Plaintiff smelled of alcohol. Further, Defendant gave Plaintiff written notice of his termination. Therefore, Defendant did not breach the Employment Agreement, and Defendant's Motion for Summary Judgment is GRANTED as to Plaintiff's breach of contract claim.

> b. ADA Claims

Defendant argues that it is entitled to summary judgment as to Plaintiff's ADA claims because the ADA permits an employer to terminate an employee for misconduct. Plaintiff argues that Defendant discriminated against him because of his substance abuse disorder. Plaintiff alleges Defendant discriminated against him because of a disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA").

The ADA's purpose is to, in part, "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities . . . . " 42 U.S.C. § 12101(b)(1). The statute provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Discrimination can come in many forms, including "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association" and "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation

13

would impose an undue hardship on the operation of the business of such covered entity . . . . " 42 U.S.C. § 12112(b)(4)–(5)(a).

When a plaintiff brings a claim under the ADA, courts use "two different rubrics, depending on whether the plaintiff relies on "direct" or "indirect" evidence of discrimination." *O'Donnell v. Univ. Hosps. Cleveland Med. Ctr.*, 833 F. App'x 605, 614 (6th Cir. 2020). Direct evidence can be used for disability discrimination claims generally, and the direct evidence framework is specifically used for claims involving failure of accommodate, failure to engage in an interactive process, and constructive discharge. *Id.*; *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016), *abrogated on other grounds by Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308 (6th Cir. 2019)*. Additionally, courts often use an indirect-evidence framework for disparate treatment and retaliation. *See O'Donnell*, 833 F. App'x at 614.

In this case, Plaintiff relies on four ADA theories of discrimination: (1) disparate treatment, (2) failure to make a reasonable accommodation, (3) failure to participate in interactive process, and (4) retaliation. None of his ADA claims can survive summary judgment.

### 1. Disparate Treatment

Plaintiff's first claim under the ADA is for disparate treatment. Under a disparate treatment analysis, the "determinative issue is the employer's intent." *Id.* at 619. With disparate treatment, plaintiffs can put forth direct or indirect evidence. Under the direct evidence standard, "a plaintiff must show that he or she (1) is disabled, (2) otherwise qualified to perform the essential functions of the position, with or without accommodation, and (3) suffered an adverse employment action because of his or her disability." *Ferrari*, 826 F.3d at 891. After a plaintiff satisfies these elements, "the employer bears the burden of proving that a challenged job criterion is essential or that a

proposed accommodation will impose an undue hardship upon the employer." *Id.* (internal quotation omitted).

Under the indirect evidence standard, courts use the *McDonnell Douglas Corp.* burden-shifting framework. *O'Donnell*, 833 F. App'x at 619. When using indirect evidence, a plaintiff must show:

1) [he] was disabled;
2) [he] was otherwise qualified for the job, with or without reasonable accommodation;
3) [he] suffered an adverse employment decision;
4) [his] employer knew or had reason to know of [his] disability; and
5) similarly situated employees were treated more favorably.

*Id.* (internal citations omitted). Once a plaintiff satisfies these requirements, the framework creates a rebuttable presumption that discrimination occurred to the plaintiff. *Id.* The burden shifts to the defendant "to articulate a legitimate non-discriminatory reason for taking the challenged employment action." *Id.*. If the defendant is successful, a plaintiff must prove that the defendant's "proffered reason was actually a pretext to hide unlawful intent." *Id.* A plaintiff can show pretext in three ways: "1) the proffered reason had no basis in fact; 2) the proffered reason did not actually motivate the employer's action; or 3) the proffered reason was insufficient to motivate the employer's action." *Id.*

In this case, there is a practical problem regarding the *prima facie* case. Defendant makes its argument using the direct evidence test while Plaintiff uses the indirect evidence test. That being said, the Parties argue regarding the second element, which is common to both tests. Defendant says that Plaintiff cannot satisfy the second element because he was a "direct threat" to patients and cannot satisfy the third element of the direct evidence test because he "cannot show he was terminated because of his disability as both the ADA and Sixth Circuit authority expressly permit

15

termination of an alcoholic for misconduct even if it resulted from his use of alcohol." [Doc. 59, PageID 1477–78].

Given that all inferences must be given to Plaintiff on this motion, the indirect evidence test is the appropriate test to use. Defendant will not be prejudiced by this as its main argument, that it could terminate Plaintiff for misconduct, applies equally under the indirect test under the second step of the *McDonnell Douglas* burden-shifting framework. Given that Defendant's argument applies equally to the indirect evidence test, and Plaintiff used the indirect test, the Court will also use the indirect evidence test. In addition to using the indirect test, the Court will also skip the first step and assume, without finding, that Plaintiff has met the requirement of *the prima facie* case.

Next, under the second step of the burden-shifting framework, Defendant must "articulate a legitimate non-discriminatory reason for taking the challenged employment action." *O'Donnell*, 833 F. App'x at 619. Defendant states that it terminated Plaintiff for misconduct, specifically, "because he performed four urological, surgical procedures under the influence of alcohol and/or drugs, and, secondarily, for his repeated inappropriate sexual language and comments to staff members." [Doc. 59, PageID 1476]. Like it did under the breach of contract claim, the Court will focus on the misuse of drugs and alcohol, which are undisputed facts in the record.

As already established, Defendant could terminate Plaintiff for his misconduct—misuse of drugs and alcohol. The Sixth Circuit has held that a person with a disability may still be punished for misconduct, and the ADA does not interfere with the employer's ability to displace an employee. *Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729, 739 (6th Cir. 2015). While quoting a regulation from the Equal Employment Opportunity Commission, the Circuit Court said ""[t]he ADA does not protect employees from the consequences of violating conduct requirements

even where the conduct is caused by the disability." *Id.* (quoting Americans With Disabilities Act: Applying Performance and Conduct Standards To Employees With Disabilities, 2008 WL 4786697, at *9). And when the "appropriate disciplinary action" is termination, "the ADA would not require further discussion about the employee's disability or request for reasonable accommodation." *Id.* at 742 (The Americans With Disabilities Act: Applying Performance and Conduct Standards To Employees With Disabilities ("2008 EEOC Guidance"), 2008 WL 4786697, at *12).

The Sixth Circuit applied these standards and regulations in *Yarberry*, in which the plaintiff-employee suffered from bipolar disorder. One night, after the defendant-employer's retail store closed, plaintiff entered the premises, played computer games, slept on beds in the store, and left in the morning without locking the door. Soon after the events of that night, the plaintiff entered a medical treatment facility. Even though the plaintiff was in treatment, the defendant terminated his employment. The plaintiff sued, arguing that he was discriminated against, and the employer sought dismissal of the case on summary judgment. The district court granted the motion, and the Sixth Circuit affirmed on the grounds that the ADA does not protect employees for misconduct even if the misconduct is caused by a disability.

Here, when discussing why it terminated Plaintiff, Defendant says that it "terminated Dr. Hatfield because he performed four urological, surgical procedures under the influence of alcohol and/or drugs, and, secondarily, for his repeated inappropriate sexual language and comments to staff members." [Doc. 59, PageID 1476]. Defendant says that this conduct violated its employment agreement with Plaintiff. Plaintiff even acknowledged so in his deposition. Plaintiff admitted that he performed surgery while under the influence of alcohol. Even if his use of alcohol stemmed

17

from a disability, the ADA allows Defendant to discipline Plaintiff for misconduct. Therefore, Defendant has satisfied its burden, and the burden shifts back to Plaintiff.

Now that Defendant has met its burden, the burden shifts back to Plaintiff, and he must show that Defendant's "proffered reason was actually a pretext to hide unlawful intent." *O'Donnell*, 833 F. App'x at 619. He can show pretext in three ways. By establishing that, "1) the proffered reason had no basis in fact; 2) the proffered reason did not actually motivate the employer's action; or 3) the proffered reason was insufficient to motivate the employer's action*." Id.*

Plaintiff argues that his "employment was pretextual in light of CMG's delay in terminating Dr. Hatfield's employment, its past treatment of other physicians, and its designation of Dr. Hatfield as eligible for rehire." [Doc. 75, PageID 3091]. While Plaintiff argues that his points create a dispute of fact, there are no disputes of fact. Defendant does not deny the dates on which it terminated Plaintiff, does not dispute how it treated past physicians, and does not dispute that it stated that Dr. Hatfield was eligible for rehire. These arguments fall under the second category, that "the proffered reason did not actually motivate the employer's action . . . . " *O'Donnell*, 833 F. App'x at 619.

Plaintiff is right about the facts for his first and third points—Defendant could have terminated Plaintiff immediately and could have listed him as ineligible for rehire. Instead, Defendant investigated and chose to make him eligible for rehire. Plaintiff is making the point that he should have been treated more harshly, and the fact that he was not treated more harshly shows pretext. In effect Plaintiff is arguing that if he was really fired for operating on patients while intoxicated, then Defendant would not have worried about an investigation or made him eligible

18

for rehire. This is a *non-sequitur*. Nothing about the investigation and rehire status undercuts Defendant's decision to terminate Plaintiff for operating while intoxicated.

As for his second argument, Plaintiff argues that Defendant's treatment of four other physicians shows that it discriminated against him. Plaintiff discusses numerous physicians that had disciplinary problems while employed with Defendant but were not terminated. Particularly, Plaintiff points to a physician known as "Physician 1." As previously mentioned above, Physician 1 was a cardiologist who had an alcohol related issue during his off-duty hours. While Plaintiff is correct that Physician 1 did have an alcohol related issue, it is of an absolutely different caliber than Plaintiff's conduct, which also included unprofessional interactions with staff. Last, Plaintiff says that pretext is shown because he was considered eligible at rehire. [Doc. 75, PageID 3092]. Plaintiff does not cite any authority explaining how these facts make a substantive difference. Further, Plaintiff glosses over the fact that conduct of the other Physicians is substantially different from his conduct. They did not perform surgery while intoxicated and take generic Xanax during surgery or on a break. In addition to the differences, Physician 5, arguably the most similar Physician, was terminated immediately after testing positive for alcohol at work.

To survive summary judgment, Plaintiff has to show evidence in the record that shows that that "the proffered reason did not actually motivate the employer's action . . . . " *O'Donnell*, 833 F. App'x at 619. Plaintiff has not shown this. Plaintiff has deposed three employees of Defendant, conducted thorough written discovery, and he has been deposed himself. Plaintiff has not put forth any evidence that any of Defendant's proffered reasons for termination were not the actual reasons for his termination. He only provides speculation.

Plaintiff states that these show a dispute of material fact regarding the reason for termination. But a reasonable jury would not look at the facts cited by Plaintiff and determine that

Defendant's reason for terminating Plaintiff had no basis in fact, did not actually motive it, or provide sufficient reason to terminate Plaintiff. *See id.*

### 2. Failure to Make a Reasonable Accommodation

Under the ADA, an employer must make "reasonable accommodations to known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee" unless it can prove that such an accommodation would impose an "undue hardship" on the business. *Yarberry*, 625 F. App'x at 741 (quoting 42 U.S.C. § 12112(b)(5)(A)). A plaintiff shows a failure to accommodate by establishing:

> 1) [he] is disabled within the meaning of the ADA;
> 2) [he] is otherwise qualified for the position and could perform the essential functions of the job, with or without reasonable accommodation;
> 3) [his] employer knew or had reason to know about [his] disability;
> 4) [he] requested an accommodation; and
> 5) [his] employer failed to provide the requested accommodation. Once a plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that any particular accommodation would impose an undue hardship on the employer.

*O'Donnell*, 833 F. App'x at 614 (quoting *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018)). Timing of the request for accommodation is crucial, especially when a plaintiff claims that a disability caused the plaintiff's misconduct. *Yarberry*, 625 F. App'x at 742 (quoting 2008 EEOC Guidance). If a request for accommodation comes after misconduct and "[i]f the appropriate disciplinary action is termination, the ADA would not require further discussion about the employee's disability or request for reasonable accommodation." *Id.* (quoting 2008 EEOC Guidance). Further, if the request for accommodation comes after misconduct, "an employer does not have to rescind discipline (including termination) warranted by misconduct." *Id.* (quoting 2008 EEOC Guidance).

Again, *Yarberry* has striking similarities with this case. After Plaintiff's misconduct, he checked into treatment. Defendant learned about the treatment and his diagnosis. Even though

defendant learned about the treatment and diagnosis, defendant terminated him anyway. The Sixth Circuit ruled that this was appropriate because the plaintiff "had already committed the misconduct that [the defendant] cited as the reason for his termination, [the defendant] was not obligated to rescind Yarberry's termination or engage in further discussion of his requests for accommodation." *Id.*

Here, like in *Yarberry*, the employee performed misconduct, and the employer learned of the misconduct. Then, the employer put the employee on leave. Next, the employer learned that the employee sought medical care for a disability. Still, the employer terminated the employee for the misconduct, and the Sixth Circuit approved of the termination.

As with disparate treatment, even assuming Plaintiff satisfied the *prima facie* case, the ADA does not prevent Defendant from terminating Plaintiff. While it may be disputed whether Plaintiff ever requested an accommodation, it is undisputed that Plaintiff did not request an accommodation before showing up to work and performing surgery while intoxicated, and taking generic during surgery or on a break from surgery. While Defendant terminated Plaintiff after he started treatment for substance abuse, Defendant had already placed him on administrative leave. The ADA does not require employers to rescind punishment, and Plaintiff gives no reason why Defendant violated the ADA for making his administrative leave more or less permanent after its investigation.

### 3. Failure to Engage in Interactive Process

Plaintiff says that his discrimination claim should not be dismissed because a genuine dispute of material fact exists regarding CMG's participation in an interactive process to find a reasonable accommodation. This genuine dispute of material fact, according to Plaintiff, exists in

regards to "whether Dr. Hatfield requested an accommodation and whether CMG participated in the interactive process in good faith." [Doc. 75, PageID 3087].

Under the ADA, "[o]nce an employee requests an accommodation, the employer has a duty to engage in an interactive process." *O'Donnell*, 833 F. App'x at 617–18 (quoting *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 854 (6th Cir. 2018)). During the interactive process, the employer and employee are required to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome these limitations." *Id.* The ADA requires the parties to act in good faith. *Id.* "Although mandatory, failure to engage in the interactive process is only an independent violation of the ADA if the plaintiff establishes a *prima facie* showing that he proposed a reasonable accommodation." *Rorrer v. City of Stow*, 743 F.3d 1025, 1041 (6th Cir. 2014).

Again, Plaintiff's misconduct sinks his claim. Even if he had requested an accommodation, which is not clear from the record, the Sixth Circuit has made clear that "an employer does not have to rescind discipline (including termination) warranted by misconduct." *Yarberry*, 625 F. App'x at 742 (quoting 2008 EEOC Guidance). The Court has already determined that the ADA did not prevent Defendant from terminating Plaintiff and did not require Defendant to give Plaintiff a reasonable accommodation; therefore, this claim must fail as well.

### 4. Retaliation

Plaintiff's last claim under the ADA is for retaliation. A retaliation claim under the ADA "is independent from and does not rise or fall with the success or failure of the underlying discrimination claim." *O'Donnell*, 833 F. App'x at 620. For an ADA retaliation claim, a plaintiff must show that:

1) [he] engaged in protected activity;
2) [his] employer was aware of the protected activity;

3) [his] employer took an adverse action against [him]; and
4) there was a causal connection between the protected activity and the adverse action.

*Id.* (quoting *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014)).

Plaintiff argues that Defendant's motion for summary judgment should be denied as to retaliation "because there are genuine issues of material fact as to whether (1) Dr. Hatfield engaged in protected activity by requesting a reasonable accommodation or (2) whether there is a causal connection between Dr. Hatfield's request for accommodation and the termination of his employment." [Doc. 75, PageID 3089].

Plaintiff's argument fails for the same reason as the other ADA claims. Even if Plaintiff had met a *prima facie* case, under Sixth Circuit law, Defendant could still terminate his employment. Because the ADA permitted Defendant to terminate Plaintiff, Plaintiff's claim fails.

c.      FMLA

Plaintiff's only remaining claims are his claims under the FMLA. He has brought two, an interference claim and a retaliation claim. "The FMLA provides eligible employees with up to "12 workweeks of leave during any 12-month period" for various reasons, including a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1). The Act prohibits an employer from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1). An employee who believes his rights under the FMLA have been violated may file suit in federal court. 29 U.S.C. § 2617." *McKelvey v. Chattanooga Publ'g Co.*, No. 1:04-CV-160, 2005 WL 8162355, at *15–16 (E.D. Tenn. Nov. 14, 2005). Claims under the FMLA generally fall into two categories: (1) the "entitlement" or "interference" theory arising under 29 U.S.C. § 2615(a)(1), and (2) the "retaliation" or "discrimination" theory arising under 29

U.S.C. § 2615(a)(2)." *Tillman v. Ohio Bell Tel. Co.*, 545 F. App'x 340, 348 (6th Cir. 2013) (citing *Seeger v. Cincinnati Bell Tel. Co.,* 681 F.3d 274, 282 (6th Cir. 2012)). Similar to the ADA, the FMLA permits an employer to terminate an employee for misconduct "but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave." *Arban v. W. Pub. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003); *see Edgar v. JAC Prods., Inc.,* 443 F.3d 501, 507 (6th Cir. 2006); *Throneberry v. McGehee Desha Cty. Hosp.*, 403 F.3d 972, 979 (8th Cir. 2005).

Substance abuse is a serious health condition under the FMLA. 29 C.F.R. § 825.119(a). Employers can terminate employees for the serious health condition of substance abuse "if the employer has an established policy, applied in a non-discriminatory manner that has been communicated to all employees, that provides under certain circumstances an employee may be terminated for substance abuse, pursuant to that policy the employee may be terminated whether or not the employee is presently taking FMLA leave." 29 C.F.R. § 825.119(b).

Likewise, the FMLA permits the termination based on misconduct. While FMLA entitles employees to 12-weeks of leave, it does not interfere with an employer's right to terminate an employee for legitimate reasons. 29 U.S.C. § 2614(a)(3)(B); *Arban*, 345 F.3d at 401 (quoting *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262 (10th Cir.1998)) ("[A]n employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting that request."); *Allen v. City of Sturgis*, 559 F. Supp. 2d 837, 846 (W.D. Mich. 2008) (Both the statute and the DOL regulation likewise establish that interference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct.). "Similarly, the right to non-interference with medical leave also is not absolute." *Arban*, 345 F.3d at 401.

24

Regarding his FMLA claim, Plaintiff argues that genuine issues of material facts exist regarding (1) whether he was entitled to FMLA leave, (2) whether Defendant improperly terminated him while using FMLA leave, (3) "whether Dr. Hatfield was engaged in an activity protected by the FMLA," (4) whether Defendant's reasons for termination were pretext, (5) "whether Dr. Hatfield engaged in protected activity when he provided an authorization to CMG so it could access his medical records at Bradford[,]" and (6) whether the temporal proximity between Plaintiff performing a protected activity and his termination creates a causal connection. [Doc. 75, PageID 3092, 3099].

### 1. Interference

To succeed on an FMLA interference claim, a plaintiff must show:

(1) [he] was an eligible employee,
(2) the defendant was an employer as defined under the FMLA,
(3) [he] was entitled to leave under the FMLA,
(4) [he] gave the employer notice of [his] intention to take leave, and
(5) the employer denied the employee FMLA benefits to which [he] was entitled.

*Edgar*, 443 F.3d at 507. Under an interference claim, "[t]he employer's intent is not a relevant part of the entitlement inquiry . . . . " *Id.* Still, an interference claim is not a strict-liability claim. *Id.* An employee "must therefore establish that the employer's [FMLA] violation caused them harm." *Id.* at 508. An interference claim will not be successful when "the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Id.* at 508. "[I]f the employer claims that the employee would have been discharged . . . the employee, in order to establish the entitlement protected by § 2614(a)(1), must, in the course of establishing the right, convince the trier of fact that the contrary evidence submitted by the employer is insufficient and that the employee would not have been discharged . . . if he had not taken FMLA leave." *Arban*, 345 F.3d at 401.

25

On a motion for summary judgment, of course, Plaintiff does not have to "convince the trier of fact that the contrary evidence submitted by the employer is insufficient and that the employee would not have been discharged . . . if he had not taken FMLA leave." *Id.* (quotation omitted). But Plaintiff must show some evidence that he would not have been discharged if he had not requested FMLA leave. Plaintiff puts forth no such evidence, and no reasonable jury could find for Plaintiff based on the evidence in the record, even after giving him all inferences.

Here, like ADA claims, even if Plaintiff satisfied the elements of an FMLA interference claim, the undisputed material facts show that Defendant had an unrelated reason for terminating Plaintiff. Plaintiff's arguments that a dispute of material fact exists are regarding whether he requested FMLA and whether he satisfied the requirements of the Act by giving Defendant limited access to his medical records. Both of these facts relate to a *prima facie* case. The fact that Defendant could terminate Plaintiff moots all of Plaintiff's arguments that disputes of material fact exist regarding his entitlement to FMLA leave and whether he properly requested leave by giving access to his medical records.

Lastly, Plaintiff, to save his claim, relies on 29 C.F.R. § 825.119, which in part states:

> The employer may not take action against the employee because the employee has exercised his or her right to take FMLA leave for treatment. However, if the employer has an established policy, applied in a non-discriminatory manner that has been communicated to all employees, that provides under certain circumstances an employee may be terminated for substance abuse, pursuant to that policy the employee may be terminated whether or not the employee is presently taking FMLA leave.

29 C.F.R. § 825.119(b). Plaintiff's misuse of alcohol and drugs is not affected by this regulation, and it therefore does not save Plaintiff's claim. Plaintiff argues that Defendant did not publish its substance-abuse policy—a requirement under the regulation—but this regulation does not apply to Plaintiff's situation because it speaks to adverse employment action based on the serious health

26

condition of substance abuse. *See id.* § 825.119(a). Plaintiff has not shown any evidence that he was terminated due to a serious health condition of substance abuse; rather, the evidence shows that he was terminated for the misuse of substances, which is not discussed in the regulation.

### 2. Retaliation

Plaintiff's last claim is for retaliation under the FMLA. ""Under the retaliation theory (also known as the discrimination theory), in contrast, the employer's motive *is* an integral part of the analysis. *See Edgar*, 443 F.3d at 508 (explaining that in retaliation cases, "the employer's motive is relevant, and the issue is whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason" (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 160 (1st Cir. 1998))). The employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights. *See Kauffman v. Fed. Express Corp.,* 426 F.3d 880, 885 (7th Cir. 2005) (observing that the retaliation theory applies where a company seeks to punish an employee "for exercising rights or opposing an unlawful procedure")." *Edgar*, 443 F.3d at 508.

"This court applies the familiar burden-shifting test articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973), to retaliation claims under the FMLA. *See Skrjanc v. Great Lakes Power Serv. Co.,* 272 F.3d 309, 313–16 (6th Cir. 2001) (applying the burden-shifting analysis to an FMLA-retaliation suit)." *Edgar*, 443 F.3d at 508. A plaintiff makes a *prima facie* case for FMLA retaliation by establishing that:

> (1) he was engaged in an activity protected by the FMLA;
> (2) the employer knew that he was exercising his rights under the FMLA;
> (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to him; and
> (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Tillman v. Ohio Bell Tel. Co.*, 545 F. App'x 340, 348 (6th Cir. 2013).

27

Like the ADA disparate treatment claim that uses the *McDonnell-Douglas* burden-shifting framework, even assuming Plaintiff can show make a *prima facie* case, his claim fails. His claim fails because Defendant has shown an adequate reason for the adverse employment action, Plaintiff's misconduct, and Plaintiff failed to show pretext. Plaintiff's argument regarding pretext on his FMLA retaliation claim is slightly different from his ADA claim. For the same reasons that Plaintiff's ADA disparate treatment claim fails, his FMLA retaliation claim fails.

## V.    Conclusion

As the movant for summary judgment, Defendant has met its burden of establishing that it is entitled to summary judgment. Defendant's motion for summary judgment [Doc. 57] is therefore **GRANTED**. All other outstanding motions are **DENIED** as moot. The Clerk of Court is **DIRECTED** to close this case. The Court will enter an order consistent with this opinion.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE
